THE BALTIMORE AND OHIO RAILROAD COMPANY *vs.*
ARTHUR GEORGE BROWN, GEORGE R. GAITHER, JR.,
and C. DODD MCFARLAND.

*Fund for Distribution—Contribution—Attorney's fees.*

Prior to the repeal of the Baltimore and Ohio Employés' Relief
Association, nineteen thousand two hundred of the twenty thous-
and three hundred and sixty-five members of the association, as-
signed all their interests therein to the railroad company in
trust for the new relief department organized by it, it being ex-
pressly stipulated in an agreement between the railroad com-
pany and the relief association, dated the 29th of March, 1889,
that if any member should refuse to join the new relief depart-
ment, the value of his membership and interest in the old asso-
ciation should be ascertained by a competent actuary, and paid
in money. Eleven hundred and sixty-five members made no
assignment of their interests, and did not join the new relief
department. Shortly after the dissolution of the relief associa-
tion, and long before its affairs were, or could have been, wound
up, two of the non-assigning members respectively filed a bill
in equity against the railroad company, alleging that the agree-
ment between the railroad company and the relief association,
was void and *ultra vires*, and praying that receivers might be
appointed to take charge of and distribute the assets of the
dissolved corporation. Upon the bill and answers in one of the
cases, receivers were appointed, but upon appeal the order was
reversed. Afterward the railroad company filed a bill against
the relief association and each of the non-assigning members,
asking the Court to assume jurisdiction over the trusts created
by the agreement of the 29th of March, 1889, and over the dis-
tribution of the assets of the extinct relief association. The
cases were by order of Court consolidated. Of the fund brought
into Court for distribution, the railroad company was adjudged
to be entitled, as the assignee of the nineteen thousand two
hundred members to ninety-four and a half per cent. and the
dissenting members to five and a half per cent. HELD:

That the attitude of the non-assigning members being directly
hostile to the railroad company and the members it represented,
there was no community of interest between them, and the
counsel for such non-assigning members were not entitled to be
compensated for their professional services out of the whole
fund in court for distribution, but only out of the five and a
half per cent. recovered by their clients.

Balto. & Ohio Railroad Co. *vs.* Brown, *et al.*

APPEAL from the Circuit Court No. 2 of Baltimore City.

This appeal was taken from an order of the Court below (HARLAN, J.) in the matter of the exceptions of the Baltimore and Ohio Railroad Company to the ratification of the auditor's report and expense account A, filed in the consolidated cases. The case is stated in the opinion of this Court.

The cause was argued before ROBINSON, C. J., BRYAN, FOWLER, PAGE, MCSHERRY and BRISCOE, J.

*Geo. Dobbin Penniman,* and *John K. Cowen,* (with whom was *Hugh L. Bond, Jr.,* on the brief) for the appellant.

*W. George Weld,* for the appellee, Arthur Geo. Brown.

*George R. Gaither, Jr.,* and *C. Dodd McFarland,* for the appellees, Gaither and McFarland.

MCSHERRY, J., delivered the opinion of the Court.

To understand the questions brought before us on these appeals we must restate briefly some of the facts which are to be found in *Balto. & Ohio Railroad Co., et al. vs. Cannon,* 72 *Md.,* 493, and *Balto. & Ohio Railroad Co. vs. Employés' Relief Assoc'n,* 77 *Md.,* 566, where the cases, out of which the pending controversy has arisen, are reported. There are two questions which we now have to deal with; and they are, first, out of what fund are the counsel fees claimed by the appellees, Messrs. Brown, Gaither and McFarland, to be paid; and secondly, what sum should be allowed these gentlemen as compensation for their services?

In 1880 the Baltimore and Ohio Employés' Relief Association was formed, and in 1882 it was incorporated by the General Assembly of Maryland. By the monthly contributions of its members, and by the amounts added by the Baltimore and Ohio Railroad Company, a fund was created out of which sick, accident and death benefits were paid; and in 1884 a pension feature, for the assistance of aged and infirm employés, was provided. All the obligations of the Relief Association were guaranteed by the Railroad Company. The funds thus collected, and now to be distributed, amount to several hundred thousand dollars. Under the original scheme, before the pension feature was added, the Railroad Company agreed to pay, and did pay, all the operating expenses of the Relief Association, amounting to about twenty-five thousand dollars per annum; but subsequently, and as one of the conditions of the formation of the pension feature, the Railroad Company and the Relief Association, through the latter's board of managers, entered into an agreement whereby the Railroad Company obligated itself to contribute annually twenty-five thousand dollars to the pension feature, provided the Relief Association would thereafter pay its own operating expenses. Thus the amount previously paid by the Railroad Company to defray the operating expenses of the Relief Association was transferred to the new feature, and in consideration thereof the Relief Association assumed the payment itself of its own operating expenses. This was consummated on July the fifteenth, 1884. In 1888 the charter of the Association was repealed—the repealing Act, however, becoming effective on April the first, 1889. Just prior to this Act going into effect, nineteen thousand and two hundred of the twenty thousand, three hundred and sixty-five members of the Association, in consideration of certain covenants made on the part of the Railroad Company, assigned in due form to the Baltimore and Ohio

Railroad Company, in trust for the new Relief Depart-
ment organized by it, all their interest in the funds of
the Employés' Relief Association. The obligations under-
taken by the Railroad Company are set forth in its agree-
ment with the Relief Association, dated March the twenty-
ninth, 1889; and amongst other things it expressly stipu-
lated that if any member should refuse to join the new
Relief Department, the value of his membership and in-
terest in the old association should be ascertained by a
competent actuary, and paid in money. Eleven hundred
and sixty-five of the members did not make any assign-
ment of their interests, and did not join the new Relief
Department, and so became entitled to the surrender value
of their interests in the old association. Shortly after the
dissolution of the Relief Association, and long before its
affairs were, or could have been, wound up, a bill in equity
was filed by Conley, and afterwards another by Cannon,
two of the non-assigning or dissenting members, against
the Baltimore and Ohio Railroad Company and the Bal-
timore and Ohio Employés Relief Association, alleging
that the agreement of March 29th, 1889, between the Rail-
road Company and the Relief Association, was void and
*ultra vires*, and praying that receivers might be appointed
to take charge of and distribute the assets of the dissolved
corporation. Upon the bill and answers in the Cannon
case receivers were appointed, but upon appeal this Court
reversed that order. 72 *Md.*, 493. In November, 1889, a
bill was filed by the Railroad Company against the Relief
Association, and each and all of the eleven hundred and
sixty-five non-assigning members, asking the Circuit Court
of Baltimore City to assume jurisdiction over the trusts
created by the agreement of March 29th, 1889, and over
the distribution of the assets of the extinct Relief Associa-
tion. In November, 1890, all the then pending cases touch-
ing these controverted matters were, by order of Court,
consolidated. A protracted controversy followed, which

was finally decided by this Court. 77 *Md.*, 566. The counsel who throughout this litigation, and under an order passed by the Circuit Court on December 19th, 1890, represented Conley and Cannon, and such of the other non-assigning or dissenting members as made themselves parties to the proceedings, now claim to be paid their fees out of the fund in Court, for their professional services; and this claim is one of the subjects of the pending appeal.

The whole fund brought into Court for distribution is $514,905. Of this sum the Baltimore and Ohio Railroad Company, as the assignee of the nineteen thousand and two hundred members, is entitled to ninety-four and one-half per cent., and the eleven hundred and sixty-five dissenting members are entitled to five and one-half per cent., or about twenty-eight thousand dollars. The Court below allowed as counsel fees to these gentlemen, jointly, the sum of twenty-four thousand dollars, to be paid out of the whole amount in Court for distribution; whereby ninety-four and a half per cent. of their fee was ordered to be paid by or out of the funds of the Baltimore and Ohio Railroad Company, which company they did not represent, and but five and a half per cent. of it was required to be paid by the parties whom they did represent. From this order both the Railroad Company and Messrs. Brown, Gaither and McFarland have appealed—the former on the ground that it is not liable for, and should not be forced to pay, any part of the fees of its adversary's counsel; and the latter because the amount allowed them is less than the sum they claim.

We said in *McGraw, et al. vs. Canton, et al.*, 74 *Md.*, 559, quoting with approval *Hand vs. Railroad Co.*, 21 *South Car.*, 178, and *Wilson vs. Kelly*, 30 *South Car.*, 483, " that one cannot legally claim compensation for voluntary services to another, however beneficial they may have been, nor for incidental benefits and advantages to

one flowing to him on account of services rendered to another by whom he may have been employed. Before legal charge can be sustained there must be a contract of employment, either expressly made, or superinduced by the law upon the facts." See *Neighbors, et al. vs. Maulsby*, 41 *Md.*, 481. When compensation is allowed out of a common fund for expenses incurred and services rendered in behalf of the common interest, it is upon the principle of representation or agency. *Wilson vs. Kelly, supra.* " Thus it will be seen that such charges are allowed, not simply· and alone because services have been rendered which have been beneficial to the common interest, but upon the ground that they were rendered by the authority of those having the common interest exercised by the representative, the compensation for which was to be chargeable to the fund protected or recovered." *Hand vs. Railroad Co., supra.* If, then, the learned, able and accomplished lawyers who claim the right to be compensated out of the common fund, now in Court for distribution, occupied during the prior litigation to which we have alluded, the same relation towards the owners of the whole of the fund that they confessedly held towards the eleven hundred and sixty-five members who did not assign, there could, we think, be no doubt that their claim should be allowed. But the Railroad Company representing the nineteen thousand and two hundred members, who joined the new Relief Department, was in a position of antagonism to most of the demands made in behalf of the nonassigning members; and whatever was gained as the fruit of the litigation for these dissenting members was not equally gained *for* the Railroad Company, but actually wrested from it; with the exception of that which was conceded by it. So that the attitude of the eleven hundred and sixty-five members was directly hostile to the Railroad Company, and the nineteen thousand and two hundred members whom it represented; and there was, in con-

sequence, no community of interest between them. There could therefore be no presumption that these gentlemen whilst acting for the eleven hundred and sixty-five members were also, at the same time, representing the Railroad Company, which they were in fact vigorously antagonizing. A reference to some of the facts will make this more apparent.

Had the object of the Conley and the Cannon bills prevailed, the new relief department which the Railroad Company by its agreement of March 29th, 1889, with the Relief Association undertook to provide for, would have been utterly destroyed (72 *Md.*, 498); and whilst in consequence of its destruction the dissenting members might have realized no greater percentage of the assets of the original Relief Association than they will now get, the nineteen thousand and two hundred members who joined the new relief department would have been deprived of their sick, accident and death benefits, and many of them would doubtless have been unable, by reason of injuries or ill-health, to procure insurance of the same character elsewhere. Had the attack made by Conley and by Cannon on the relief department been effective, the persons who would have been injured by the proceeding would have been the nineteen thousand and two hundred members whose interests the Railroad Company was directly representing and protecting when it successfully resisted the effort to place all the assets in the hands of receivers, and frustrated the attempt to wind up and dissolve the department itself. We are at a loss to see how proceedings which, had they been successful, were fraught with such disastrous consequences to all the members of the new relief department that comprised nearly ninety-five per cent. of the members of the old relief association, can be said to have been prosecuted in the interest, or for and in behalf, of the very persons upon whom the loss or injury, had it been permitted to occur, would have fallen.

Again, in the Cannon case the pension feature of the Relief Association was assailed, and it was claimed that the $84,991.63 which had been transferred in 1884 from the relief fund to the pension feature, and which upon the dissolution of the Relief Association had been assigned with all the other assets to the Baltimore and Ohio Railroad Company, had been wrongfully transferred, and was fraudulently retained in the pension feature. Every one of the nineteen thousand and two hundred members who had joined the new relief department was obviously interested in retaining this sum of money in the pension feature. But the equally obvious interest of the eleven hundred and sixty-five dissenting members was to secure a share of this fund. Manifestly, the counsel who represented the latter could not have represented the former, for the interests of the two classes—the assigning, on the one hand, and the dissenting on the other—were diametrically hostile and antagonistic.

Finally, it was insisted in the consolidated cases, on behalf of the non-assigning members, that the Railroad Company, which held, under the contract of March 29th, 1889, the funds of the extinct Relief Association, had no right to pay, after March the thirty-first, 1889, the date of the Association's dissolution, any sick or accident benefits to members who had become sick or who had been injured prior to that day, but whose sickness or disability continued thereafter. And this view was held by the Court below, but, upon appeal by the Railroad Company, was reversed in this Court. 77 *Md.*, 566. The effect of this contention, if it had been finally sustained, would have been to deprive every sick or disabled member, after March 31st, 1889, of his monthly benefit, if he had become sick or had been injured prior to that date; or else the effect would have been to compel the Railroad Company to refund for distribution the amounts which it had thus, in good faith, paid out under the agreement of March

29th, 1889. Clearly, both as respects the assigning members and the Railroad Company, these services of the appellees upon this branch of the litigation were not, and even had their labors been successful, would not have been in any way beneficial, though the parties they immediately represented would have been gainers thereby, had they prevailed.

These salient points of the past controversy are sufficient, it seems to us, to show that there was no community of interest in these instances between the dissenting eleven hundred and sixty-five members, and the great body of the members who joined the new relief department; and that, therefore, the services rendered by the counsel of the former in respect of these contentions, were, and could have been, of no possible assistance to the latter. Thus far, then, the case falls within the principle we have referred to as settled in *McGraw vs. Canton, supra*; and hence those who were not benefited by the services of the appellees ought not to be required to pay therefor.

By an inadvertent failure to comply with the provisions of the Relief Association's constitution, the appropriation of the funds thereof under the agreement of July the fifteenth, 1884, to the payment of its operating expenses, was held by this Court in 77 *Md.*, 566, to be unauthorized, and the Railroad Company was required to account, as part of the gross assets of the Association, for the sums so paid for operating expenses, with interest, aggregating altogether nearly two hundred and twelve thousand dollars. This part of the litigation resulted in increasing the amount of funds for distribution among the non-assigning or dissenting members to the extent of their proportion of this sum, and thus and that far benefited the parties represented by the appellees. But occupying, as they did, throughout, a position of uncompromising hostility towards the Railroad Company, they were obviously not representing it when they successfully asserted this

liability *against* it; and they manifestly gained for *it* nothing that it did not already fully possess under the assignments held by it from the nineteen thousand and two hundred members.

It is thus, we think, perfectly clear that the case at bar up to this point, is distinguishable from *Davis, Brydon, et al. vs. Gemmell, et al.*, 73 *Md.*, 530, where the counsel of the minority stockholders of a mining company were compensated out of the fund which their labors had rescued from misappropriation by the majority stockholders, and had preserved for the benefit of the rightful owner, the corporation. The minority stockholders were in fact representing the interests of the company, and the services of their counsel resulted in the company securing the fund, whereby its creditors and all its stockholders reaped an advantage which otherwise would have been lost. The same rule has for a long time obtained in relation to proceedings for restoring property to the use of a charity, which has been unjustly diverted therefrom. *Atty. Genl. vs. Brewers' Co.*, 1 *P. Wms.*, 376; *Atty. Genl. vs. Kerr*, 4 *Beav.*, 297. And so the same rule is constantly applied to creditors' bills in equity, where a fund has been realized by the diligence of the plaintiff. *Trustees vs. Greenough*, 105 *U. S.*, 527. " Having come in and proved and obtained the benefit of the suit which was instituted on their behalf, as well as that of the plaintiff, it cannot be just that in such a suit—a suit instituted for the benefit of all the creditors—one alone should bear the burden, when others have the benefit." *Thompson vs. Cooper*, 2 *Coll.*, 87; *Mason vs. Alexander*, 3 *West. Rep.*, 450. But that is precisely what did not occur here, as we have already shown. The Railroad Company, the assignee of the nineteen thousand and two hundred members, and the real antagonist of Conley and Cannon, was in no way benefited by the litigation conducted by the learned counsel who represented on the opposite

side of the docket a totally different and actively hostile interest.

There is one other circumstance which must be considered as bearing on the cross-appeal taken by Messrs. Brown, Gaither and McFarland. And that is their claim to be compensated for adding, as the result of their labors, the sum of $100,000 to the distributable assets. This claim was disallowed by the Court below.

When the Relief Association was organized the Railroad Company passed a resolution contributing six thousand dollars a year, being the equivalent of six per cent. interest on $100,000, towards the relief fund; but when the prospectus of the Relief Association was issued this contribution of the Railroad Company was stated to be a donation of one hundred thousand dollars to the association. When the Cannon bill was filed claiming that the Railroad Company owed the Relief Association this sum of $100,000, the Railroad Company in its answer denied the averment and relied upon the resolution as passed by the directors of the company appropriating $6,000 a year to the general fund. But later on, viz., on January the sixth, 1890, the Railroad Company, in paragraph fourteen of its amended answer in the same case, submitted the question of its liability for the $100,000, instead of for only six per cent. interest on that sum, to the judgment of the Court, and tendered itself ready and willing to account for the same; and from that time on it does not appear ever to have contested the propriety of treating this $100,000 as a part of the assets of the Relief Association; and this is made quite clear by the testimony of Mr. Hugh L. Bond, one of the counsel of the Railroad Company. All this transpired nearly a year before these gentlemen were appointed by the order of December, 1890, to prosecute the claims of Conley and of Cannon, and the other non-assigning members who became parties to the suit. Whatever services these gentlemen rendered with

reference to securing this sum of $100,000 were rendered *before* their appointment as counsel under the order of December, 1890, and whilst they were acting as counsel for only Conley and Cannon. For such services they are obviously not entitled to compensation out of the fund, or to be paid by any one but the clients they then represented.

The remaining question relates to the amount of the fee. As the total sum realized for the eleven hundred and sixty-five members was $28,000, we think (with great deference to the opinions of the distinguished lawyers whose certifications appear in the record, but who based their estimates upon the assumption that the whole fund for distribution would be charged with the fee) that twenty-four thousand dollars is entirely too large a fee under all the circumstances of the case. It is not by any means a pleasant task for a Court to pass upon the value of services of members of the bar, but we cannot escape doing it; and after the best reflection we have been able to give to the subject and without going into a discussion of the facts, we all agree that twenty-five hundred dollars to each of the three counsel—making seventy-five hundred dollars altogether—is a just and reasonable allowance out of the $28,000 distributable to the clients they represent; and out of that fund these fees must be paid.

For the reasons we have assigned, so much of the order appealed from, and dated March the twelfth, 1894, as disallows a fee for the alleged recovery of the one hundred thousand dollars hereinbefore referred to, will be affirmed; and so much of the same order as fixes the aggregate amount of the fee at $24,000 and charges its payment upon the whole fund in Court, will be reversed.

> *Order in this case reversed, the costs, above and below to be paid out of the fund in Court, and cause remanded.*

(Decided 21st June, 1894.)