FREEMYER v. INDUSTRIAL MUTUAL INDEMNITY COMPANY.

Opinion delivered November 6, 1911.

INSURANCE—DISSOLUTION AND REINSURANCE—RIGHTS OF DISSENTING POLICY HOLDERS.—Where a mutual life insurance company was dissolved, and a fund voluntarily accumulated by it as a reserve fund for the benefit of its policy holders was, with the consent of a large majority of the policy holders, used in purchasing reinsurance for the benefit of all of its policy holders, whether such action was wrongful or not, the rights of the few dissenting policy holders are sufficiently protected by an order setting apart to them their proportionate share of the reserve.

Appeal from Pulaski Chancery Court; *John E. Martineau,* Chancellor; affirmed.

*Chamberlin & Townsend,* for appellants.

1.  Corporations possess only such powers as are expressly or impliedly granted.  To this may be added: that such acts

as are not by implication prohibited, and are beneficial and necessary to carry into effect the powers conferred, may be exercised. The powers are measured by the grant. Thompson on Corp. (2 ed.), § § 2101-2106; 4 Wheat. (U. S.), 518; 118 S. W. 390; 130 S. W. 162; 125 *Id.* 1001; 128 *Id.* 348; 139 U. S. 24; 73 Pac. 79. Where the law is silent, the power does not exist. Kirby's Digest, § § 937 to 948; 59 N. J. Eq. 589; 118 S. W. 390; 7 Okla. 220; 70 Miss. 669; 51 How. Pr. (N. Y.) 1; 33 Barb. (N. Y.) 578; 22 Cyc. 1420.

2. The act of transferring or consolidating with the Arkansas Life Insurance Company is *ultra vires* and void. Thompson on Corp. (2 ed.) § § 2765-2770; 139 U. S. 24; 145 *Id.* 393; 118 S. W. 395; 51 How. Pr. (N. Y.) 1; 98 N. W. 672; Pom. Eq. Jur. § 1093; Thompson on Corp. (2 ed.) § § 2106 and 2771.

3. An *ultra vires* act can not be ratified. Thompson on rp. (2 ed.) § 2776; 10 Cyc. 1070 and notes 43, 44; 139 S. 24; 76 Vt. 303; 238 Ill. 100; 194 N. Y. 409; 87 N. E. 167; 101 U. S. 71; 33 N. J. Eq. 155; 52 Pac. 1067; 73 Pac. 79; 160 U. S. 514; 167 U. S. 362; 71 Fed. 797; 21 Fed. 533.

4. An ordinary or general proxy does not authorize a vote to dissolve the corporation or sell the entire business and property, nor authorize a vote upon other important business matters unless the power is given in general or special terms. Thompson on Corp. (2 ed.) § 880; 122 Ia. 731; 13 Abb. N. Cas. (N. Y.) 210; 33 Barb. (N. Y.) 578; 100 Pac. 781.

5. A stockholder or a minority of stockholders may enjoin the officers or the corporation from doing unlawful or *ultra vires* acts. 127 Misc. 412; Thompson on Corp. (2 ed.) § 1314; 21 Pac. 1133; 6 N. Y. S. 255; 83 Pa. St. 19; 53 Tex. 56; 18 Ark. 341; Pom. Eq. Jur. § 1093; 73 N. Y. S. 403. A court of chancery can and will undo an act which is *ultra vires.* 125 Ala. 263; 2 Spelling on Corp. § 615; 120 Ill. 447; 22 Fed. 578; 65 Conn. 336; 4 Thompson on Corp. § 4491; 2 Pom. Eq. § 1095; 1 Morawetz on Corp., § 262; 5 A. & E. Corp. Cases (N. S. ) 92.

6. A court of chancery has no power to decree a moneyed compensation in satisfaction of plaintiff's claim. 125 Ala. 263; 75 N. C. 8; 126 N. C. 977; 128 *Id.* 465; 59 N. J. Eq. 589.

No brief for appellees.

McCULLOCH, C. J.  The Industrial Mutual Indemnity Company was, in the year 1900, organized under the statutes of this State authorizing the incorporation of associations "for benevolent purposes or for the mutual benefit of its members." Kirby's Digest, § 937 *et seq.* This statute provides that "no profits or dividends shall ever be declared or paid under this act; provided, dividends may be paid to the amount of money paid in by the stockholders on their respective shares." Kirby's Digest, § 947. The purpose of the organization was to issue policies of life, health and accident insurance to its members on a mutual plan, the character of the business to be what is known as industrial insurance. The business of this company was successfully conducted from year to year until it attained considerable proportions, there being at the time of the occurrences which form the basis of the present controversy about 13,000 policy holders or members, and an accumulated reserve fund amounting to about $28,000, which constituted the total assets of the company. This reserve was accumulated pursuant to the following by-law adopted at the outset by the association as a part of its working plan, towit:

"This company shall accumulate and hold, as rapidly as the business of the company will permit, a reserve or emergency fund, which shall be sacredly kept to pay alone its policy contracts to members that may become due at any time in case the current or ordinary funds of the company are insufficient to meet the same. The reserve fund shall be the same as the laws of Arkansas require of regular legal reserve life insurance companies."

At the annual meeting of stockholders in 1909 a plan was proposed to organize an independent stock company for the purpose of doing the same character of business, and a resolution was passed authorizing this to be done. It was thought by the managing officers of the company that it had reached the limit of its volume of business, and that to organize a new company on a stock basis would make it possible to do a much larger and safer business and to extend operations beyond the limits of the State. The plan was to organize a new company, with an authorized capital of $200,000, of which $100,000 was to be subscribed and paid in, the amount of $50,000 was to be offered at par to policy holders of the old company in proportion

to the several amounts of their policies, and the remainder to be sold to any takers at a premium of 60 per cent. above par value. The new organization was effected under the name of the Arkansas Life Insurance Company, and the requisite amount of stock was sold and paid for according to the plan outlined. The officers of the new company were the same individuals who were officers of the old company. At the annual meeting of the stockholders of the old company in January, 1911, the new company being then duly organized according to law and ready for business, the following resolution was adopted:

"*Resolved*, by the policy holders of the Industrial Mutual Indemnity Company, in annual meeting, as aforesaid:

"1.   That the Board of Directors of the Industrial Mutual Indemnity Company be and they are hereby authorized, impowered and instructed to enter into a reinsurance agreement with the said Arkansas Life Insurance Company, whereby the said Arkansas Life Insurance Company agrees to assume all insurance, risks, and all other obligations covered by or embodied in the policies of insurance by and in force in the said Industrial Mutual Indemnity Company, together with any and all other debts and liabilities outstanding against the Industrial Mutual Indemnity Company.

"2.   That, when the said reinsurance agreement is executed, the said directors of the said Industrial Mutual Indemnity Company are hereby authorized, impowered and instructed to transfer to the said Arkansas Life Insurance Company all existing and outstanding contracts of insurance, together with all assets.   * * *

"3.   That the said directors are hereby authorized, impowered and instructed to use their own judgment as to the proper time and method of making the said transfer, provided the same shall be made at such time and in such manner as in their judgment will be to the best interest of the policy holders of the said Industrial Mutual Indemnity Company."

Pursuant to the above resolution the board of directors of the old company entered into a contract with the Arkansas Life Insurance Company, whereby the latter took over the assets of the old company, and in consideration thereof undertook to reinsure all policies of the old company then in force and to assume all its debts and liabilities. The assets of the

old company at that time amounted to $20,553.07, having been recently reduced by losses in business caused by inroads made by a rival company which had secured the services of the corps of soliciting agents of this company.   This amount was, according to the evidence in the case, less than the sum necessary to procure reinsurance of the company's policies in any other reputable stock insurance company.   The plaintiff, A. M. Freemyer, who was a policy holder in the Industrial Mutual Indemnity Company and had been a soliciting agent for that company until he went over to a rival company at the time mentioned above, instituted this action in the chancery court of Pulaski County against the Industrial Mutual Indemnity Company and its principal officers, W. W. Hurst, H. H. Julian and C. Strickland, to restrain said transfer of assets to the Arkansas Life Insurance Company.   It is alleged, in substance, that said officers of the company were grossly mismanaging its business and affairs, and were fraudulently attempting to divert the assets of the company by transferring the same to the Arkansas Life Insurance Company without the consent of the stockholders.   Subsequently twelve other policy holders appeared in the action, and on their motion were joined as parties plaintiff.   Substantially all of the other 13,000 policy holders accepted the terms of the reinsurance contract and surrendered their several policies for the purpose of having a reinsurance slip attached thereto.   Said defendants, Industrial Mutual Indemnity Company and its officers, answered the complaint, denying said allegations as to mismanagement or fraudulent transfer of assets, and alleged that said transfer had been made upon due authority of the stockholders as hereinbefore recited.   The Arkansas Life Insurance Company filed an interplea, setting forth its interest in the litigation by reason of said reinsurance contract and acquisition of the assets of the Industrial Mutual Indemnity Company under said contract. It offered to pay any amount which the courts should find to be due said plaintiffs, if anything, out of the assets of the old company.   The plaintiffs then filed a supplemental complaint and reply to the interplea of the Arkansas Life Insurance Company, concluding with a prayer that the contract between the Industrial Mutual Indemnity Company and the Arkansas Life Insurance Company be cancelled, and that a receiver be

appointed to take charge of the restored assets of the former company and to carry out the further orders of the court with respect thereto. Testimony was taken in the case, and on final hearing the chancellor denied the prayer of the complaint for an injunction and for the appointment of a receiver, and found that the plaintiffs were entitled to their proportions of the assets of the old company which constituted the reserve under the by-laws and rendered a decree therefor as follows: To A. M. Freemyer $8.22, Pearl Freemyer $0.93, Nellie Freemyer $9.74, Viola Smith $19.00, Josephine Cameron $0.68, A. B. Cameron $5.12, J. L. Cameron $5.02, Jewell Cameron $5.20, E. L. Scott $29.70, D. L. Ewell $7.89, Viola Ewell $7.28, and Jeff Stanley $4.54. Four of the plaintiffs, after the rendition of the decree, elected to accept the reinsurance contract of the Arkansas Life Insurance Company, instead of the amounts awarded to them out of the reserve, and the other plaintiffs appealed to this court.

It is contended here by counsel for plaintiffs that, under the record made, "the contract should be rescinded, and a receiver appointed to take charge of the defendant company and its assets, to reorganize it, or, if it is found so badly disorganized as to warrant that, its affairs be wound up according to the statute and its assets distributed among the rightful owners."

The argument of counsel has taken a much broader range than we deem it necessary to cover in deciding this case upon its merits, as we do not think the general subject of the power of a corporation of this kind to merge itself into or consolidate with another or to reorganize itself into a new company is involved. The reserve fund, which constituted the so-called assets of the company, and which was accumulated, not under an express statute authorizing it, but under a by-law of the company, could be used in procuring reinsurance upon the same authority which provided for the accumulation of the fund, viz., the stockholders acting through a majority thereof. There is nothing in the statute which expressly or by implication forbids the use of accumulated funds in reinsuring policies, nor was it inconsistent with the company's plan to use the fund for that purpose. The fund being a voluntary accumulation under the by-laws, we can not see how a limitation can be placed on

the power of the company, under the direction of the majority of the stockholders, to use it for any legitimate purpose in the protection of policy holders.   The contract for reinsurance has been fully executed and accepted by the large body of policy holders, all save the few dissenting plaintiffs.   The old company has ceased to do business, and its tangible assets are gone, having been used in paying for reinsurance.   It is, for all practical purposes, dead and can not be rehabilitated by any action of the court.   Nothing could be accomplished by the appointment of a receiver, and in this situation the court can do that which works out substantial justice to all interested parties.   This the chancellor did by awarding to the plaintiffs a justly proportionate share of the reserve.

The practical dissolution of the old company having been effectuated beyond the power of the court to prevent it, the remaining question is only one as to the remedy of dissenting stockholders, and, as said by the Missouri Supreme Court in a recent case, when "the case turns on a question of remedy, the court applies the law *ex aequo et bono*, with due regard to the rights of the plaintiff and also with due regard to the rights of the defendants and others whose interests may have become involved."   *Tanner* v. *Lindell Ry. Co.*, 180 Mo. 1, 79 S. W. 155, 103 Am. St. Rep. 534.

The same principle was clearly announced by the Maryland Court of Appeals in a case which involved the distribution of the fund of a corporation which had been improperly transferred to another corporation with the consent of a large majority of the stockholders, and the appointment of a receiver was asked to wind up the affairs and distribute the fund.   The court said:

"We are of opinion that the rights of all parties may be disposed of in a court of equity without regard to the validity of the agreement and transfer.   Whether void or not, they have been so far executed that it would be impossible to place the parties *in statu quo*.   If a mistake was made by the association and the railroad company in the method adopted to wind up the former, and if, as we have seen, 20,000 of the 21,000 members of the dissolved corporation ratified and confirmed the supposed error because it was clearly to their benefit to do so, as is the case here, the assignee of the assets of the dissolved corporation is already in a court of equity, admitting its entire

responsibility to account for the same, as the court shall order, and has shown that it is ready and able to give ample security for the payment of any sum of money the appellee may be entitled to, we see no reason why, as the case now stands, the defendant should not be allowed and required as trustee to settle with the appellee and those in like position with him in such manner as the court shall direct." *Baltimore & Ohio Rd. Co.* v. *Cannon,* 20 Atl. 123, 72 Md. 493.

It is quite clear from the evidence that the organization of the new company was intended to be for the best interests of the policy holders in the old company, and that the change was fairly accomplished without fraud or intentional disregard of the rights of any one

It should be added to what is already said that the testimony wholly fails to sustain the charge of mismanagement or bad faith on the part of the officers of the company.

We conclude that the chancellor was correct in refusing to appoint a receiver, and that he awarded to plaintiffs all the relief to which they were entitled after having refused to accept the terms of the reinsurance contract. Decree affirmed.

HART, J., concurs in the judgment.

KIRBY, J., dissents.